## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

METAFI PRO LIMITED,                    §
                                       §
              *Plaintiff*,             §      CIVIL ACTION  NO. <u>1:24-cv-1180 (DNH</u>/CFH)
                                       §
v.                                     §
                                       §      PLAINTIFF'S VERIFIED ORIGINAL
NY TRADING, INC.; STARCO               §      COMPLAINT AND DEMAND FOR JURY
LOGISTICS, INC.; WENZONG DUAN          §      TRIAL
d/b/a WLT TRADING, LLC; and COLONY     §
POND MANAGEMENT, LLC,                  §
                                       §
              *Defendants*.            §

### INTRODUCTION

1.      NOW COMES Plaintiff, Metafi Pro Limited ("Metafi"), and files this Verified

Original Complaint, together with an Application for Temporary Restraining Order and Order

to Show Cause Why a  Preliminary Injunction Should not Issue, as against Defendants, NY

Trading, Inc. ("NYT"); Starco Logistics, Inc. ("Starco"); Wenzong Duan d/b/a WLT Trading,

LLC ("Duan" or, collectively, "WLT"); and Colony Pond Management, LLC ("Colony

Pond")(collectively, "Defendants"), relating to the disappearance of thousands of WhatsMiner

Server-M50s ("Miners") ordered and paid for by Metafi, and would for cause of action

respectfully show unto the Court the following:

### JURISDICTION AND VENUE

2.      This Honorable Court has diversity jurisdiction under 28 U.S.C. § 1332 because

no defendant is a citizen of the same State as plaintiff, and the amount in controversy is more than

$75,000, not counting interest and costs of court. Jurisdiction is also proper because substantial

part of the conduct made the basis of this suit took place within this judicial district, and the actions

of Defendants leading to Plaintiff's damages took place, in part, within this judicial district.

1

Specifically, this Court has jurisdiction over Defendants as, on information and belief, they each have committed tortious acts within this judicial district; failed to perform contractual obligations within this judicial district; and made statements and representations to individuals for services to be provided within this judicial district. The ultimate effect of these schemes was to defraud the Plaintiff, who has suffered millions of dollars in losses.

3.      This Honorable Court also has original federal question jurisdiction over the subject matter of this action pursuant to 28 U.S.C § 1331 because Plaintiff has asserted a cause of action arising under the laws of the United States, specifically 49 U.S.C § 14706.

4.      Venue is proper under 28 U.S.C § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district, or a substantial part of the property that is the subject of this action is believed to be situated within this judicial district.

## PARTIES AND SERVICE OF PROCESS

5.      Plaintiff, Metafi, is a corporation organized under the laws of the State of Delaware, and with its principal place of business located in the State of Delaware. As such, it is deemed to be a citizen of the State of Delaware. 28 U.S.C.A. § 1332(c)(1).

6.      Defendant, NYT, is a corporation organized under the laws of the State of Wyoming and is located at 30 North Gould Street, Suite N, Sheridan, WY 82801, and may be served with process through its registered agent, **Northwest Registered Agent Service Inc., 30 North Gould Street, Suite N, Sheridan, WY 82801**. On information and belief, NYT regularly conducts business within this judicial district, including as it relates to the transactions at issue in this litigation.

7.      Defendant, Starco, is a corporation organized under the laws of California and is located at 4700 Gregg Road, Pico Rivera, CA 90660, and may be served through its registered agent, **Xiaogang Chen, at 4700 Gregg Road, Pico Rivera, CA 90660**. On information and belief,

Starco regularly conducts business within this judicial district, including as it relates to the transactions at issue in this litigation.

8.      Defendant, Duan, is an individual of the full age of majority and a resident of the State of Nevada. At all times pertinent, Duan held himself out to be the Managing Member of WLT, which, on information and belief, was dissolved by Duan on March 28, 2023, before Duan contracted with NYT for international logistics and customs clearance services relating to transactions at issue in this litigation. Duan may be served at **Reno, NV**. Duan was doing business as WLT, a dissolved limited liability company organized under the laws of the State of Nevada, which may be served through its registered agent in an abundance of caution, **NORTHWEST REGISTERED AGENT, LLC, 401 Ryland Street, Suite 200 A, Reno, NV 89502**.

9.      Defendant, Colony Pond, is a limited liability company organized under the laws of the State of New York and is located at 122 Fairfield Drive, Holbrook, NY 11741, and may be served with process through the **Secretary of State of New York** as its agent. On information and belief, Colony Pond regularly conducts business within this judicial district, including as it relates to the transactions at issue in this litigation.

## RELEVANT FACTS

10.      The following facts are supported by the declaration of Yi Sun. *See* Exhibit 1.

### *Metafi Purchases Miners from NYT*

11.      On or about June 30, 2023, Metafi and NYT entered into a Sales and Purchase Agreement ("Purchase Agreement") for the purchase of 4,500 WhatsMiner Server-M50 with the hashrate of 120T and delivery of total hashrate of no less than 540,000 TH ("Miners"). "Hashrate" refers to the total combined computational power that is being used to mine and process transactions on a Proof-of-Work blockchain, such as BitCoin.

12.     Under the Purchase Agreement, Metafi was to pay NYT a total of $8,370,000.00 ("Purchase Price") for the Miners. NYT was required to deliver the Miners to Metafi's designated hosting sites within 10 working days, failing which Metafi was entitled to terminate the agreement, and NYT was obligated to return the amounts paid by Metafi for undelivered Miners.

***Metafi Hires NYT to Transport the Miners***

13.     On or about July 7, 2023, Metafi and NYT entered into a Logistics Service Agreement ("Shipping Agreement"), whereby NYT was to ship the Miners it had sold to Metafi from Hong Kong, China, and Thailand to the United States and other regions. The agreement became effective as of June 29, 2023, per terms set forth in recitals.

***NYT's Obligations to Metafi***

14.     Under the Purchase Agreement and the Shipping Agreement, NYT was expressly obligated to transport, deliver, and safeguard the Miners in the following, non-exclusive, respects:

   a. NYT shall ensure that all goods are delivered on time and in good condition to the carrier designated by Metafi;

   b. NYT shall bear the risk of loss of the goods due to any circumstances before delivery to the carrier;

   c. NYT shall be responsible for all the loss of Miners caused by the transportation of the Miners or any third party, or theft of the Miners during transportation from NYT to Metafi. Once the situation as such happened, NYT would contact the insurance company for compensation and NYT shall pay the compensation to Metafi after any damage or loss;

   d. NYT shall ensure that the Miners would be insured for no less than 110% of the value of all Miners;

   e. If Miners are damaged or lost during transportation, NYT shall be liable for compensation and shall assist Metafi in seeking compensation from the insurance company;

   f. If Miners delivered by NYT are inconsistent with the quantity of the goods previously received, Metafi may require compensation from NYT for the loss;

4

g.   The Purchase Agreement shall be governed by the laws of New York, USA;

h.   The Chinese version of the Shipping Agreement shall prevail in case of any discrepancy exists in translation.

***NYT Farms Logistics Out to WLT/Starco***

15.   On information and belief, NYT contracted with Defendant WLT for international logistics and customs clearance services relating to the Miners.

16.   Based on the Nevada Secretary of State business entities portal, WLT is dissolved, with Articles of Dissolution having been filed on March 28, 2023, before NYT would have contracted with WLT in connection with Metafi's Miners. Defendant Duan is identified as the sole Managing Member of WLT and was conducting business in his individual capacity under the guise of a dissolved entity.

17.   Neither WLT's involvement nor the fact of its dissolution were disclosed by NYT to Metafi at the time the Purchase Agreement and the Shipping Agreement were entered between NYT and Metafi.

18.   On information and belief, WLT, in turn, contracted with Starco to transport and/or store the Miners within the U.S. pending instructions from NYT on further shipments to Metafi's designated hosting sites.

***Metafi Contracts With Colony Pond for Miner Hosting Services***

19.   For utilization of the hashrate of the Miners, on November 9, 2023, Metafi entered into a Hosting Services Agreement with Colony Pond ("Hosting Agreement"). Under the Hosting Agreement, Colony Pond was required to provide co-location and hosting services for 1900 Miners by providing 6.5 MW of electricity and relevant maintenance services at Colony Pond's facility.

20.     Although Colony Pond could move and re-install the Miners to a different but equally comparable location on its site to facilitate continuous Miner operation, it could not do so without Metafi's written permission.

21.     Metafi paid to Colony Pond a security deposit in the amount of $652,000.00 under the Hosting Agreement.

22.     Under the Hosting Agreement, Colony Pond was expressly obligated to safekeep the Miners by providing commercially reasonable "all-risk" property liability insurance for its premises and its activities at the premises and not moving the Miners from their agreed upon location without the written approval of Metafi.

23.     The Service Agreement shall be construed under the laws of the State of New York.

***Metafi is Damaged by the Actions of NYT, WLT, and Starco***

24.     Metafi fulfilled its obligation under the Purchase Agreement by paying to NYT a total of $8,370,000.00 for the Miners. Yet, according to associated bills of lading, NYT delivered to the U.S. only 4,365 of 4,500 Miners in breach of the Purchase Agreement. The resulting shortfall of 27,352 TH at $15.50 per TH amounts to USD $423,956.00 in losses to Metafi in the first instance.

25.     NYT next breached its agreement with Metafi by failing to deliver 1,900 of the 4,365 Miners to Colony Pond. According to NYT, it actually shipped 1,902 Miners to Colony Pond.

26.     On information and belief, NYT, in conjunction with WLT and Starco, arranged for said shipment either negligently or with reckless disregard for the protection of the Miners from loss or theft. As a result, only 616 Miners reportedly reached Colony Pond. Taking NYT's shipment figure of 1,902 as true, for the 1286 Miners lost or stolen on NYT/WLT/Starco's watch,

Metafi has been damaged in the amount of USD $2,512,983.00 ($2,391,960 Equipment value, plus cost of shipping and customs).

27.     In addition, Metafi has lost mining revenue associated with the missing Miners. Metafi conservatively estimates that from December 1, 2023, to August 31, 2024, the potential profit for operating 1286 Miners would be 55.19 bitcoins. After factoring in costs, the associated profit loss is estimated at over USD $2,759,500.00 and continues to accrue.

***Metafi is Damaged by the Actions of Colony Pond***

28.     Metafi fulfilled its obligation under the Hosting Agreement by paying to Colony Pond a security deposit in the amount of USD $625,000.00.

29.     In late 2023, according to NYT, 1902 Miners were loaded from a warehouse in Pico  Rivera, California, onto two trucks for delivery to Colony Pond's hosting site in New York. One such truck was loaded with 934 Miners ("Truck 1"), and the other with the remaining Miners ("Truck 2").

30.     Colony Pond acknowledged arrival of only Truck 1 at its hosting site, but claimed only 616 of the 934 Miners allegedly loaded onto Truck 1 were delivered.

31.     Metafi requested an inspection of the Miners in Colony Pond's possession, or other form of verification of Colony Pond's claims, but Colony Pond failed to cooperate.

32.     On information and belief, Colony Pond retains possession of all 934 Miners valued at USD $1,737,240.00, and is using the same for its own benefit and to Metafi's detriment.

33.     Ultimately, Colony Pond reported it was unable to host any of the Miners in its possession due to a failure of its physical facilities; namely, a power outage. In doing so, Colony Pond breached and/or repudiated the agreement between these parties.

34.     Per the Hosting Agreement, Colony Pond was required to provide "all-risk" insurance for the activities at its premises, including damages resulting from power loss.

35.     From December 1, 2023, to August 31, 2024, 934 Miners would have conservatively produced 39.17 bitcoins, resulting in an estimated USD $1,958,500.00 in lost profits for Metafi.

36.     On December 19, 2023, Metafi advised Colony Pond that it wished to terminate the agreement due to Colony Pond's failure to cure its breach, and the daily revenue lost by Metafi as a result. In an effort to mitigate its damages, Metafi also requested that its Miners be packed up and made ready for pick-up. After some delay, Colony Pond advised that the Miners had been moved (without prior notice to Metafi as required under the Hosting Agreement) and were not available for pick-up.

37.     To date, Colony Pond remains in possession of between 616 to 934 Miners; has failed to provide hosting services for same; has failed to refund to Metafi its security deposit despite termination of the Hosting Agreement; and has otherwise failed to make Metafi whole.

38.     On or about April 25, 2024, Metafi made a formal demand upon all Defendants, to no avail. This lawsuit follows.

## FIRST CLAIM FOR RELIEF
### (Breach of Contract - Purchase Agreement – NYT)

39.     Metafi re-alleges and reiterates the foregoing paragraphs as if set forth fully herein.

40.     The elements of a breach of contract action are:  1) the existence of a valid contract; 2) performance or tendered performance by the plaintiff; 3) breach of the contract by the defendant; and 4) damages sustained by the plaintiff as a result of the breach.  *Shami v. Grocery Leasing Corp.*, 2024 NY Slip Op 02552, ¶ 1, 227 A.D.3d 836 (App. Div.)

41.     The Purchase Agreement is a valid contract between Metafi and NYT for the purchase of 4,500 Miners. Metafi performed under the contract by paying the Purchase Price, but NYT breached the contract when it delivered only 4,365 of the 4,500 Miners purchased by Metafi; that is, 135 miners short in the first instance.

42.     As a result, Metafi has been damaged in the amount of **USD $423,956.00,** which represents the purchase price of $251,100.00 for the 135 Miners short, plus the resulting shortfall of 27,352 TH at $15.50 per TH for those same Miners, together with expectancy, reliance, and restitution damages, as well as, Metafi's reasonable and necessary attorney's fees and costs.

**SECOND CLAIM FOR RELIEF**
**(Breach of Contract – Shipping Agreement - NYT)**

43.     Metafi re-alleges and reiterates the foregoing paragraphs as if set forth fully herein.

44.     The elements of a breach of contract action are:  1) the existence of a valid contract; 2) performance or tendered performance by the plaintiff; 3) breach of the contract by the defendant; and 4) damages sustained by the plaintiff as a result of the breach.  *Shami v. Grocery Leasing Corp.*, 2024 NY Slip Op 02552, ¶ 1, 227 A.D.3d 836 (App. Div.)

45.     The Shipping Agreement is a valid contract between Metafi and NYT for the transport to the U.S. of 4,500 Miners to be further distributed within the U.S. to Metafi's designated hosting sites. Metafi performed under the contract by paying shipping fees when due, but NYT breached the contract by failing to deliver at least 1,286 of 1,900 Miners to Colony Pond.

46.     As a result, Metafi has been damaged in the principal amount of **USD $2,512,983.00**. In addition, Metafi has lost mining revenue associated with these 1,286 Miners undelivered to Colony Pond. Metafi conservatively estimates that the potential profit for operating 1286 Miners from December 1, 2023, to August 31, 2024, is around 55.19 bitcoins. After factoring in costs, the associated profit loss is estimated at over **USD $2,759,500.00**, and continues to accrue,

9

together with expectancy, reliance, and restitution damages, as well as, Metafi's reasonable and necessary attorney's fees and costs.

### THIRD CLAIM FOR RELIEF
#### (Breach of Contract –Hosting Agreement - Colony Pond)

47.     Metafi re-alleges and reiterates the foregoing paragraphs as if set forth fully herein.

48.     The elements of a breach of contract action are:  1) the existence of a valid contract; 2) performance or tendered performance by the plaintiff; 3) breach of the contract by the defendant; and 4) damages sustained by the plaintiff as a result of the breach.  *Shami v. Grocery Leasing Corp.*, 2024 NY Slip Op 02552, ¶ 1, 227 A.D.3d 836 (App. Div.)

49.     Metafi fulfilled its obligation under the Hosting Agreement by paying to Colony Pond a security deposit in the amount of **USD $625,000.00**.

50.     In late 2023, Colony Pond admits that it came into possession of at least 616 Miners. The actual number of Miners received by Colony Pond were 934, if other Defendants' assertions are to be believed.

51.     On information and belief, Colony Pond retains possession of 934 Miners valued at **USD $1,737,240.00**, and is using the same for its own benefit and to Metafi's detriment.

52.     Because Colony Pond reported that it was unable to host any of these Miners in its possession due to a power outage, Colony Pond breached and/or repudiated its contract with Metafi.

53.     In the five months that followed delivery in or around December 1, 2023, 934 miners would conservatively have produced 39.17 bitcoins, resulting in an additional estimated **USD $1,958,500.00** in lost profits for Metafi, together with expectancy, reliance, and restitution damages, as well as, DSE's reasonable and necessary attorney's fees and costs.

**FOURTH CLAIM FOR RELIEF**
**(Double Brokering in Violation of 49 C.F.R. Sec. 371 –NYT, WLT, and Starco)**

54.     Metafi re-alleges and reiterates the foregoing paragraphs as if set forth fully herein.

55.     A broker is one who arranges for transportation "by an authorized motor carrier." Brokerage services can be performed "on behalf of a motor carrier, a consignor or consignee" not on behalf of another broker. *See* 49 C.F.R. Sec. 371.2. A broker is required to keep records, showing the amount of freight charges it collected and "the date of payment to the carrier." *See* 49 C.F.R. Sec. 371.3. Any company that brokers a load in violation of such an expressed warranty has committed misrepresentation and a technical violation of the regulations that provide "a broker shall not directly or indirectly represent its operations to be that of a carrier." *See* 49 C.F.R. Sec. 371.7.

56.     According to the Federal Motor Carrier Safety Administration ("FMCSA"):

> "A broker or freight forwarder who knowingly engages in interstate brokerage or freight forwarding operations without the required operating authority is liable to the United States for a civil penalty not to exceed $10,000 and can be liable to any injured third party for all valid claims regardless of the amount."

57.     Metafi contracted with NYT to broker the transportation of its shipment of Miners from their origin to their final destinations in the U.S. and other regions. NYT contracted with WLT and/or Starco to store the Miners in New York and execute transportation of the Miners to their final destinations on NYT's behalf.

58.     Unbeknownst to Metafi, said defendant(s) then contracted with an undisclosed third party to transport 1,900+ Miners to Colony Pond's hosting facility, of which 1,284 Colony Pond reported never reached their facility.

59.     As a result, Metafi has incurred damages, including millions of dollars in financial

losses and other related expenses.

## FIFTH CLAIM FOR RELIEF
### (Conversion – WLT, Starco, and Colony Pond)

60.     Metafi re-alleges and reiterates the foregoing paragraphs as if set forth fully herein.

61.     A conversion takes place when someone, "intentionally and without authority, assumes or exercises control over personal property belonging to someone else, interfering with that person's right of possession." *Colavito v. N.Y. Organ Donor Network, Inc.*, 8 N.Y.3d 43, 49 (2006); *see also State v. Seventh Regiment Fund*, 98 N.Y.2d 249 (2002). The elements of conversion are (a) that the plaintiff actually had the right to possess the property; and (b) the defendant actually assumed control over such property in a manner that infringed on the plaintiff's rights.

62.     Metafi had the ultimate right to possess the property it purchased from NYT; namely, the Miners. At least 1,900 of those Miners under the control of WLT or Starco remain unaccounted for. On information and belief, said defendants have assumed control of at least 1,284 Miners that Colony Pond contends never made it to Colony Pond, thus infringing on Metafi's rights.

63.     Colony Pond acknowledged receipt of the remaining 616 Miners. WLT and Starco contend that 934 Miners should have been received by Colony Pond. Nevertheless, while under the control of Colony Pond, all of these Miners have also disappeared.

64.     Metafi demanded to inspect the Miners Colony Pond claims to have received, but Colony Pond has been unresponsive. On information and belief, Colony Pond has assumed control of between 616 to 934 Miners, thus infringing on Metafi's rights.

65.     As a result, Metafi has been damaged in the amount of USD **$3,652,969.00**, which represents the value of the 1,902 Miners gone missing under WLT/Starco. Of this amount, USD

$1,437,782.00 is attributable to Colony Pond.

### SIXTH CLAIM FOR RELIEF
**(Fraudulent Inducement and Fraudulent Misrepresentation – NYT and Colony Pond)**

66.     Metafi re-alleges and reiterates the foregoing paragraphs as if set forth fully herein.

67.     Elements of fraud are (1) A material misrepresentation or omission of fact, (2) knowledge of its falsity, (3) an intent to defraud, (4) reasonable reliance on the part of the plaintiff, and (5) resulting damage to the plaintiff. *Schlaifer Nance & Co. v. Estate of Warhol*, 119 F.3d 91, 98 (2d Cir.1997); *Centro Empresarial Cempresa S.A. v. América Móvil, S.A.B. de C.V.*, 17 N.Y.3d 269 (2011).

68.     NYT represented to Metafi that it had "mature experience" as a company engaged in international cargo transportation all the way through delivery to Metafi's designated destination in the U.S. and other regions; that it would "properly provide the end to end transportation services according to the delivery requirements of [Metafi]"; that it would purchase "commercial full insurance which shall cover the full value of" the Miners (110% of their value) and related expenses; that it would deliver the Miners to their destination in a timely and safe manner; and that it would maintain and provide certain documents relating to the transport of the Miners. NYT also represented to Metafi it would track business volume, complete final delivery as designated by Metafi, and timely reconcile and settle with Metafi. In the event goods were lost during transportation, such as here, NYT represented that it would be liable to compensate Metafi.

69.     NYT's representations proved to be false. Their falsity was known to NYT who, on information and belief, failed to procure insurance, failed to disclose that it or its affiliates were double-brokering Metafi shipments, failed to deliver Miners to their final destination at Colony Pond, and failed to maintain records related to this transport.

70.     Metafi relied upon these material representations when deciding to engage NYT

for the purchase and transport of the Miners and has suffered damages as a direct and proximate result.

71.     Colony Pond represented to Metafi that it had the resources and capacity to host 1900 Miners at its facility, including providing temperature and humidity controlled physical facilities with commercially reasonable ventilation for properly functioning Miners and commercially reasonable security, together with internet connectivity, and electricity for the operation of the Miners. In the event of an interruption of Hosting Services caused by a failure of the physical facilities, interconnectivity or electricity provided by Colony Pond, Colony Pond represented that it would promptly notify Metafi and promptly correct the issue. Colony Pond further represented that it would set up, rack, and install the Miners within ten (10) business days of receipt. Colony Pond further represented that Metafi would be permitted to physically visit its facility to monitor the Miners up to four times per year. Still further, Colony Pond represented it will provide commercially reasonable "all-risk" property liability insurance for its premises and its activities at the premises, which would include hosting activities.

72.     Colony Pond's representations proved to be false. Their falsity was known to Colony Pond who, on information and belief, failed to procure insurance, failed to provide electricity for the operation of the Miners, failed to timely set up, rack, and install the 616 Miners it acknowledged receiving,  and failed to allow Metafi on its premises even once to monitor the Miners at issue.

73.     Metafi relied upon Colony Pond's material representations when deciding to engage Colony Pond for hosting services for the Miners and has suffered damages as a direct and proximate result.

74.     As a direct and proximate result of Defendants' representations, assurances,

misrepresentations and false statements and omissions of material fact, and Metafi's reasonable reliance thereon, Metafi has suffered actual damages, including economic losses, lost business opportunity, attorney's fees, interest, and other damages, direct and consequential, plus pre- and post-judgment interest as allowed by law and such other relief to which it may be legally and equitably entitled, including exemplary damages and attorney's fees.

75.     The acts of the Defendants as alleged in this claim for relief were willful, wanton, malicious and oppressive, and undertaken with an intent to defraud and justify the awarding of exemplary and punitive damages.

### SEVENTH CLAIM FOR RELIEF
### (Strict Statutory Liability Under 49 U.S.C § 14706 –NYT, WLT, and Starco)

76.     Metafi re-alleges and reiterates the foregoing paragraphs as if set forth fully herein.

77.     A common carrier transporting goods interstate under a bill of lading is liable to the person entitled to recover under the bill of lading for actual loss of property. *See* 49 U.S.C § 14706; See also *Sec. Ins. Co. v. Old Dominion Freight Line*, 2003 U.S. Dist. LEXIS 14682, *13.

78.     Metafi has sustained damages of **at least USD $2,512,983.00**, which represents the value of the 1,902 missing unit of the Miners that NYT, WLT, and Starco shall be strictly liable for under 49 U.S.C § 14706.

### EIGHTH CLAIM FOR RELIEF
### (Conspiracy – NYT, WLT, and Starco)

79.     Metafi re-alleges and reiterates the foregoing paragraphs as if set forth fully herein.

80.     Civil conspiracy is established when there is (1) a primary tort; (2) an agreement between two or more parties; (3) an overt act in furtherance of the agreement; (4) the parties' intentional participation in the furtherance of a plan or purpose; and (5) resulting damage or injury. *Abacus Fed. Sav. Bank v Lim*, 75 A.D.3d 472, 474.

81.     NYT, WLT, and Starco together and/or in conjunction with Colony Pond have colluded to abscond with 1902 Miners belonging to Metafi for their personal gain. On information and belief, NYT, WLT, Starco, and/or Colony Pond conspired to deprive Metafi, a foreign entity, of 1902 of its Miners. This belief is generally derived from the fact that each Defendant is a link in the transportation and servicing chain that led to the disappearance of said Miner, each with no paper trail of the events leading to the disappearance.

82.     Specifically, Defendants conspired to get Metafi's business by holding NYT, the face of the Defendants, out as a company with "mature experience" that would "properly provide the end to end transportation services according to the delivery requirements of [Metafi]"; purchase "commercial full insurance which shall cover the full value of" the Miners (110% of their value) and related expenses; deliver the Miners to their destination in a timely and safe manner; maintain and provide certain documents relating to the transport of the Miners; track business volume, complete final delivery as designated by Metafi, and timely reconcile and settle with Metafi; and, in the event goods were lost during transportation, such as here, be liable to compensate Metafi. Defendants made these misrepresentations to induce Metafi to act by hiring NYT for its logistics needs. Defendants then engaged in a scheme to double-broker shipments of Metafi's Miners to maximize their bottom lines, unbeknownst to Metafi. When 1902 of the Miners went missing, NYT, WLT, and Starco further conspired to misdirect Metafi to delay prosecution.

83.     This collective effort of all Defendants resulted in substantial damages to Metafi.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff, METAFI PRO LIMITED., respectfully prays that, upon final hearing of this matter, the Court enter a judgment granting the following relief, jointly and severally, against each and all of the Defendants:

a.       Actual damages;

b.       Economic losses and lost business opportunity;

c.       Expectancy, reliance, and restitution damages;

d.       Exemplary and punitive damages for Defendants' fraud in an amount to be deemed

appropriate by the trier of fact;

e.       Reasonable and necessary attorney fees as provided for by law;

f.       Costs of suit;

g.       Pre- and post-judgment interest; and

h.       All other relief, legal or equitable, direct or consequential, to which DSE may show

itself to be justly entitled.


Signed on September 26, 2024.

Respectfully submitted,


*/s/ Benjamin W. Hill*
Benjamin W. Hill (LOCAL)
NYBN: 514953
ben@capezzahill.com
CAPEZZA HILL, LLP
30 South Pearl Street, Suite P-110
Albany, New York 12207
o. 518 478 6065
m.518 879 0023
f. 518 407 5661

HENNA GHAFOOR (LEAD, PENDING PRO HAC)
FEDERAL BAR NO.: 2258471
TBN: 24079867
hghafoor@mp-lg.com
ETHAN ZHANG (PENDING PRO HAC)
FEDERAL BAR NO.: 3856063
TBN: 24124466
ezhang@mp-lg.com

MOSAIC Paradigm Law Group PC
10370 Richmond Avenue, Suite 850
Houston, Texas 77042
Telephone: (281) 805-7169
Facsimile: (281) 805-7172

**ATTORNEYS FOR PLAINTIFF,**
**METAFI PRO LIMITED**